(18 App. Div. 223.)

ROLLINGS v. LEVERING et al.

(Supreme Court, Appellate Division, Second Department. June 8, 1897.)

1. MASTER AND SERVANT—SAFE APPLIANCES.
    Where defendants furnished hooks for a platform to be swung under eaves to enable an employé to paint a building, and the employé had no right of selection, the obligation rested on defendants to exercise reasonable care in furnishing hooks safe for the purpose to which they were to be applied.

2. SAME—DELEGATION OF DUTY.
    The duty to furnish safe appliances cannot be delegated by a master to another so as to relieve the master from obligation.

3. SAME—EVIDENCE.
    In an action for injuries caused by the breaking of hooks used to support a platform, evidence as to whether a test was made of the hooks before using them by the master was admissible on the question as to the exercise of reasonable care in furnishing such hooks.

Appeal from trial term.

Action by Walter Rollings, administrator of John N. Meyer, deceased, against William M. Levering and William A. Garrigues. Judgment for plaintiff. From the judgment and an order denying a motion for new trial, defendants appeal. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Charles C. Nadal, for appellants.
E. J. McCrossin, for respondent.

HATCH, J. The hook which was used to support the platform upon which the deceased stood at the time of the accident was somewhat different from the hooks commonly used for that purpose. The condition which required that.the platform should be swung under the projection in order to reach the side of the structure where the paint was to be applied necessitated the peculiar form of the hook in order to accomplish that result. Four hooks substantially of this form had been made; two some days before, which were then in use, and two which were used to support the platform which fell. The deceased therefore had no power of selection of hooks, but could only make use of the particular ones furnished. The hook became, therefore, an appliance used in and about the prosecution of the work, and the obligation rested upon the defendants to exercise reasonable care in furnishing a hook suitable and safe for the purpose to which it was to be applied. This duty to exercise reasonable care is absolute, and may not be delegated to another so as to relieve the master from its obligation. Tomaselli v. Cycle Corp., 9 App. Div. 127, 41 N. Y. Supp. 51. The evidence in the present case permitted of the conclusion that the hook broke by reason of its defective character, whereby the platform was precipitated to the ground, resulting in the death of the plaintiff's intestate. This was founded upon the testimony that the hook, if made properly, of good iron, would support a weight of more than a ton. It broke under a strain not exceeding 450 pounds. Examination of the broken parts of the hook tended to establish that the iron was poor, that crystallization was apparent, and that the iron had been burned. This brings us to a consideration of the question whether the defendants were responsible for the condition of the hook, and whether they have discharged the obligation which rested upon them to furnish a safe and suitable appliance. Boivie was foreman of the painters, and the deceased worked under him. He was directed by superior authority to make use of some discarded iron tie rods which had been removed from the Brooklyn Bridge. He selected several of these rods, and delivered them to a blacksmith in the employ of the defendants, with a drawing of the form of the hook required, and directed him to make the same. The blacksmith did as directed. Boivie obtained them after they were finished, and delivered them to the deceased and his assistant, who fastened them to the cornice upon the building, and suspended the platform therefrom. Testimony was given which tended to establish that an expert in iron might have detected that the iron had been burned, upon inspection. But it is evident that this condition was not apparent to ordinary inspection, and the jury were authorized to find that a person not expert in the examination of iron would not, by mere inspection, be able to detect any defect therein, and one witness testified that defects of this character could only be detected by an actual test. It was also shown that the strength of the hook could have been easily and effectively tested by rapping it with a hammer, or by dropping it from a height, and that by these means the weakness might easily be discovered. In forging the iron a test could be made, and its condition be discovered. It is claimed by the plaintiff that none of these tests were made, in consequence of which

the defendants failed in discharge of the duty which rested upon
them.

By the defendants it is claimed that the iron furnished for the
hook was of good quality, and that the blacksmith, in forming it,
could and did determine that it was not defective. His testimony
upon this subject is not entirely satisfactory of the fact that he tested
the strength of the iron, or that he possessed sufficient knowledge to
make one. It does not appear that any request was made of him
to test the strength or quality of the iron by Boivie or by any one else.
He was asked:

"Q. What does the fact that a piece of iron an inch and a quarter thick, that
can be turned into an eye, such as is shown on this piece, indicate as to the
quality of the iron? A. Well, that I never studied so much as to go to that.
Q. Does it indicate anything about the iron,—whether it is good or bad? A.
Yes, the iron will show for itself when you get the heat on it. I mean to say,
as a blacksmith, I could see when it is heated whether or not it is good or bad.
I can tell a good piece of iron as soon as I get the heat on it,—whether it is
going to work good or bad. Q. In case of a piece of iron or rod five feet long
or thereabouts, where the eye or the end has been turned as in this piece, does
that indicate anything about the quality of the entire rod? A. No, sir; I don't
think it does. One end of it that I turned might be good and the other part be
bad. I can't see all through the bar of iron, you know. Q. What is the usual
way in which a blacksmith would test a rod of iron that is five feet long,
used to put up a scaffold to hold painters on? A. Well, to bend an eye like
that you want it white hot. Q. What would be the test as to the quality of the
iron? A. Well, you could tell the iron by whether it separated or not right
in the eye, right in a short bend like that. I heated the hook at other parts,
only a little bit over cherry red, for to bend the hook; that is all. I heated it
throughout of course. * * * Q. Did you heat it enough to discover whether
or not the iron was good or bad? A. No, sir; it never showed no flaw one way
or the other. By the Court: Q. He asked you whether you made enough test
to determine whether all the iron was good or not. A. Well, so far as that is
concerned, why I did. The iron was good. Q. Was it what is a proper test,
and the usual test? A. Yes, sir; it was good; the iron was good."

This witness further testified that he did not burn the iron, and that
the pieces produced upon the trial were not burned. On cross-
examination the witness testified that he made no further test than
to make the hook, cut the thread off, and bend the eye. Being fur-
ther pressed upon the subject, this appeared:

"Q. Did you test the iron before you heated it? A. I didn't test it any fur-
ther than by bending the eye. I found the eye bent all right. I did not test
it before I heated it. I did test it after I heated it. I tested it by bending the
eye. Q. Is that the only test that you made? A. So far as working on the
other part of it. That is the only test, and bending the other part. That is the
only test that I could make. I do not know of any other test now that I might
have made. Q. What I want to know, and what I want you to answer up and
down, is, is that the only test that you did make? A. Well, I couldn't make no
further than that. After I had finished it, I laid this iron down. It was
taken away in the afternoon—in the evening—by Mr. Boivie; took it away him-
self. I saw him take it away. Mr. Boivie didn't ask me to test it,—anything
about it."

It was quite permissible for the jury to find from this testimony,
as we think, that the blacksmith made no test to determine the
sustaining strength of the iron or of the hook, either before it was
made or after. He was undoubtedly able to determine the character
of the end of the iron which he turned into the eye, mostly for the

reason that it required good iron to turn the eye. But as to the other part he recognized, what the jury would be authorized to say, that the mere heating it to about a cherry red would not test the quality of that part of the iron unless it broke or cracked in the process. The witness does not say that he made a test to discover any defect by this means. He only says that this was all he did, and he explicitly says that the turning of the eye would not disclose defects if existing in other parts. This fairly appears from the fact that the hook did not break in the eye, but in its other parts. While the witness did say, in general terms, that the iron was good, yet this was not conclusive, as he explains fully what he did in order to determine that fact. He knew of no other test that he could make than by forming the hook. But this cannot avail as an establishment of the fact in the face of the other proof. The witness was not asked to make a test. The jury could say that he did not think one necessary, and that the only knowledge he possessed was such as his opportunity and experience gave him when he forged the hook, and that such knowledge was not sufficient, or not sufficiently exercised, to enable him to determine the capacity of the hook. In addition to the proof tending to establish that no sufficient test was made of the iron or the hook, is the evidence of two witnesses that they called the attention of the foreman to the hooks, and informed him that they were not safe for use for the purpose intended. There was no explicit denial of this testimony by the foreman. Of course, liability of the defendants is not to be predicated alone upon the fact that the defendants failed to make a test of the hook, if the jury so found. The evidence of whether a test was made or omitted to be made was admissible, together with the other evidence in the case, upon the question of whether the defendants had discharged their duty to exercise reasonable care in furnishing the hook. Upon the whole case we are of opinion that a case was made by the plaintiff entitling him to have submitted to the jury the question of defendants' negligence.

If there was any question of contributory negligence upon the part of the deceased or the other person upon the platform with him, the verdict of the jury has answered it in plaintiff's favor.

The court was asked to charge the jury that, if the defect in the hook was occasioned by the negligence of the blacksmith, it would constitute negligence of a fellow servant, for which no recovery can be had. As we have already seen, the hook constituted an appliance, and therefore the primary duty was upon the master to exercise reasonable care in the discharge of the obligation. This duty he could not delegate to another. Hankins v. Railroad Co., 142 N. Y. 416, 37 N. E. 466; Crispin v. Babbitt, 81 N. Y. 516. We have examined the other rulings complained of and find no error therein.

The judgment should be affirmed, with costs. All concur.